### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

DEBORAH BRANGMAN,      :
    Plaintiff,          :
                     :       CIVIL ACTION
    v.                  :       NO. 12-351
                     :
ASTRAZENECA, LP, ASTRAZENECA   :
PHARMACEUTICALS, LP and     :
METROPOLITAN LIFE INS. CO.    :
PARTNERS, LP, et al.,        :
    Defendants.         :

June 19, 2013                                          Anita B. Brody, J.

### MEMORANDUM

Plaintiff Deborah Brangman brings suit against Defendants AstraZeneca LP and

AstraZeneca Pharmaceuticals, LP ("AstraZeneca").  Brangman alleges that AstraZeneca

subjected her to disparate treatment on the basis of her race and gender in violation of Title VII

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I), and the

Delaware Discrimination Employment Act ("DDEA"), 19 Del. C. 710, *et seq.* (Count II), and

discriminated against her on the basis of her disability under the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101, *et seq.* (Count V) and Delaware Persons with Disabilities

Employment Protection Act, 19 Del. C. 720, *et seq.* (Count VI).  She alleges that AstraZeneca

retaliated against her in violation of Title VII (Count III), the DDEA (Count IV), the ADA

(Count VII) and the Delaware Persons with Disabilities Employment Protection Act (Count

VIII).  Additionally, Brangman alleges that AstraZeneca violated the Delaware Whistleblowers'

Protection Act, 17 Del. C. § 1701, *et seq.* (Count IX) and that AstraZeneca interfered in its

1

insurer MetLife's determination of her long term disability benefits under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. (Count X).[1]

I exercise federal question jurisdiction over Brangman's Title VII and ADA claims

pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the claims brought under

Delaware law pursuant to 28 U.S.C. § 1367.

AstraZeneca has filed a motion for summary judgment, seeking judgment in its favor

against Brangman on all of her claims.  I will deny Defendant's motion for summary judgment

on Counts I and II(Title VII and DDEA discrimination claim on the basis of race and gender)

because genuine issues of material fact exist.  Because there is a genuine issue of material fact as

to whether Brangman's supervisor knew that she reported him to the compliance department, I

will deny AstraZeneca's motion for summary judgment for Count IX, Brangman's whistleblower

claim.  Because I find that a plaintiff may bring DDEA claims in conjunction with Title VII

claims, I will deny AstraZeneca's motion for summary judgment on Brangman's DDEA claims,

Counts II and IV.

I will grant in part and deny in part AstraZeneca's motion for summary judgment as to

Brangman's Title VII and Delaware Discrimination retaliation claims, Counts III and VII, as

follows: the motion is granted as to Brangman's claim that she was retaliated against under Title

VII for whistleblowing, and Brangman's claim that AstraZeneca retaliated against her for filing

an EEOC charge by terminating her and interfering with MetLife's long-term disability decision.

The motion is denied on the claim that AstraZeneca retaliated against her in connection with the

EEOC charge by denying her short term disability benefits, and her retaliation claim concerning

her August 2009 internal complaint.

---

[1] This memorandum is restricted to Brangman's claims brought against AstraZeneca, and does not cover the ERISA claims Brangman has brought against MetLife.

For reasons described below, I will grant AstraZeneca's motion for summary judgment for Counts V, VI, VII, VIII and X (Brangman's ADA, ADA retaliation and ERISA claims).

## I.   BACKGROUND[2]

Deborah Brangman worked for the biopharmaceutical company AstraZeneca in various marketing positions from 1996 until she was terminated in 2011.  She is an African American woman with an MBA degree from the Wharton School of the University of Pennsylvania.  In February 2008, she became Director of Learning Services within AstraZeneca's Customer Alignment Organization.  As a director, she collaborated with senior leadership across marketing and sales groups to develop training initiatives.  Her initial supervisor for this position, Kevin Guerette, graded her "on the high end of partially met," in her 2008 year-end performance review, commenting that she needed to work on developing her leadership skills. Brangman claims that Guerette told her that initially he intended to rank her as "fully met," but at the "calibration meeting" he attended, where managers create alignment in the evaluation process, other members of the calibration team urged him to lower her ranking to "partially met." According to Brangman, Guerette was disturbed that he was forced to lower her ranking, and said that he decided to say that she did not network enough because it was the least offensive thing he could say.  Guerette denied that he made those statements.

In the spring of 2009 Brangman began reporting to Peter Brockie, a white male.  Her title became Director of Training and Development, though her position was essentially the same.  In July 2009, there was a meeting to introduce managers and directors to a new program called the Marketing Academy.  Consultants from an outside agency were also present.  At this meeting,

---

[2] For purposes of summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (alteration in original) (internal quotation marks omitted).

Brockie asked Brangman to go get coffee for one of the consultants in front of other managers and directors.  Brangman was "mortified and humiliated," but complied with his request.  She testified that she felt like his request was "a derogatory comment" that was "racially-motivated," because "black people have historically been in servant roles," as well as "gender related."

About a week later, Brockie asked Brangman if she wanted to attend a dinner that night for key people on a project, and asked if she would drive one of the consultants back to his hotel after the dinner was over.  Brangman did not feel that it was her job to drive consultants around, and felt that her invitation hinged on whether or not she could drive the consultant.  At the dinner she told Brockie that she lived in the opposite direction from the hotel, and he drove the consultant back.  Brangman participated in a political discussion that took place at the dinner. The following Monday, Louise Butler, who had been present during the conversation, told Brangman that Brockie was a little upset because she had been loud when voicing her opinion. Butler later testified that Brockie did not tell her to speak with Brangman about the issue. Rather, Butler volunteered to discuss it with Brangman herself.

On August 6, 2009, Brockie wrote Brangman's mid-year review.  He emphasized that Brangman did a good job of facilitating work, but that he wanted to see her take on more of a leadership role during the second half of the year.  He wrote that she "seems to operate in a chaotic fashion," and that he would like to see her improve her organization and attention to detail. Def. Ex. I. at 8.  He noted that "[s]he seems to be easily flustered and/or intimidated," and that "her deliverables are often 'just in time' and seem to be rushed.  *Id.*

On August 17, 2009, Brangman's attorney sent a letter to AstraZeneca complaining that Brockie had engaged in a pattern of harassment and discrimination against her.  Thereafter AstraZeneca launched an internal investigation led by Melissa Ayers.  After interviewing

Brockie, his manager, and Brangman, Ayers concluded that Brangman's allegations could not be substantiated.  Ayers suggested that Brockie monitor his interactions with Brangman, a suggestion that comported with AstraZeneca's practices when employees file complaints against their supervisors.

After she made her complaint, Brangman claims that Brockie's discriminatory behavior continued.  In September 2009, Brangman's workload significantly increased when Brockie shifted Brangman's projects that were due in 2010 to be completed in the fourth quarter of 2009. Brockie had asked her if it would be feasible to shift her workload in this manner, and she confirmed that it would.  In December 2009, at a meeting related to the launch of the Marketing Academy, Brockie thanked Brangman's white male colleagues for their intellectual contributions to a project, and only thanked her for the room set-up.  Also in December 2009, Brockie held a dinner party where he invited all of the people he supervised except for Brangman.  It was not an AstraZeneca dinner, and he paid from his own pocket.  Brangman claims that Brockie interfered with a work project in January 2010, creating confusion and making her look bad.  In February 2010, Brockie began closely monitoring Brangman's whereabouts and attendance.

Preparations for year-end performance reviews took place in December 2009.  On November 13, 2009, Brockie e-mailed Brangman and the other people he supervises that they should complete a self-assessment of their performances by December 4, 2009.  The calibration meeting for the performance reviews ended up taking place on December 3, 2009.  Brangman's colleague Matt Lehman and other peers received a phone call on December 2 that the deadline for the self-assessment had moved up.  Because she was not notified, Brangman did not provide input on her performance at the calibration meeting.  Brangman was also troubled that Brockie did not ask for peer reviews for her until a week after the calibration meeting, on December 11.

Brockie states that he does not consider peer feedback to be determinative of an individual's overall performance evaluation.  Brangman believes that different standards were applied to her white, male colleagues Greg Looney and Matt Lehmann, that their reviews contained peer feedback, and that they were not judged by how they looked.

Brockie met with Brangman to discuss her year-end performance review for 2009 in March 2010.  For her year-end review, Brangman received a rating of "partially met."  Brockie noted that he "did not see Debbie become the leader I had expected," that some of her deliverables were late or just in time, and that he wanted her to focus on attention to detail.  Ex. J, Ex. 2. at 17-18.  Brangman testified that she believes that at the calibration meeting, Brockie stated aloud to senior leadership that she "couldn't be trusted," in reference to her ability to review documents.  She testified that Human Resources Business Partner Tracy Fabian confirmed that Brockie said this when she met with Brangman in March 2010.  Brockie does not recall saying that she "couldn't be trusted," or writing that in her review.  This language does not appear in the final version of her 2009 year-end review.

During this time period, Brockie used a slide in a PowerPoint presentation at a meeting that, according to Brangman, violated the "federal anti-kickback law."  She did not inform Brockie.  Instead, she e-mailed the presenter, Russell Pocock, to remove the slide from the presentation.  Pocock removed the slide, and sent an e-mail to Brockie and copied Brangman, confirming he had deleted the slide "as per Debbie's request re compliance."  Pl. Ex. 87, 227:11-15; Pl. Ex. 22.  Following this e-mail, Brangman observed that Brockie did not send out a correction e-mail, so she made a report to AstraZeneca's compliance department.  She reported her complaint confidentially to the compliance department, and met with Commercial Compliance Investigations Senior Manager Arthur McCarthy in AstraZeneca's Compliance

6

Department to discuss the matter.  She told McCarthy that she wished to remain anonymous, and the Compliance Department kept her complaint confidential at all times.  McCarthy did not tell Brockie that Brangman made the report.  The Compliance Department directed Brockie to notify the employees of the error and to correct it.  On March 9, 2010, Brockie sent Brangman an e-mail describing the correction.  He instructed her to send the e-mail out to the participants, and to copy Brian Martin, Arthur McCarthy and himself.  Brangman did not send the correction e-mail because she felt it made it seem like it was her mistake, and could potentially make her criminally liable.  Brockie eventually sent the correction e-mail instead.

In March 2010, Brangman learned that her position was being eliminated because AstraZeneca had created a Commercial Learning Organization ("CLO") to centralize training for sales and marketing.  Prior to the creation of the CLO, only Brangman provided training for marketing, while a large group provided training for sales.  Senior Director of Commercial Sales Learning Dave Ilconich was tasked with creating the structure for the CLO, and then determining which existing positions would be eliminated as a result.  Ilconich and Brockie maintain that Brockie played no role in this decision.  Brangman believes Brockie was involved in the decision because he had meetings with Dave Ilconich, and he provided input into the design of the organization.  Brangman stated, "I know that interviews were set up with Peter [Brockie] to talk about—because Dave Ilconich stopped by my office before he met with Peter to talk about training in the new organization."  Pl. Ex. 87, 21:8-12.  Brockie sent an e-mail to Ilconich on March 3, 2010 inquiring as to whether Brangman's position would remain in the new structure.  Brockie had come from a meeting where the attendees had discussed candidates for key positions in the new organization, and wrote to Ilconich:

> As I understand it, you will have a director level position specifically for
> Marketing.  Do you know when that position will post?  On a second note, have

you designed the position such that Debbie Brangman would or would not map into it.  Need to know ASAP as if she is not mappable (don't think that's a real word) we need to give her formal notice that her current job is being eliminated.

Pl. Ex. 27.  On March 5, 2010, Brockie and Tracy Fabian met with Brangman to inform her that her position is being eliminated and that she would have an opportunity to interview for positions in the new Commercial Learning Organizations.

On March 25, 2010 Brangman interviewed for two leadership positions in the CLO that she had applied for.  The interview panel consisted of Dave Ilconich, Keisha Bronson, and RoseAnn Scanlon.  The group decided not to offer Brangman either position.  According to Dave Ilconich, this was because the panel felt that, based on her answers during the interview, Brangman did not possess the requisite level of leadership for either position, did not act decisively enough, and provided minimal information on how she developed her subordinates in her current and previous jobs.  The panel concluded that others were more qualified for the position.  Brangman believes that she did not receive either position because she saw that the interviewers had a copy of Brockie's 2009 "partially met" performance review, Brockie manufactured an attendance problem days before her interview, and that he had read his 2009 year-end performance review of Brangman aloud at the December 2009 calibration meeting, during which he stated that Brangman could not be trusted.  Pl. Resp. at 32.

Brangman testified that Brockie

had an impact and it was far and wide.  Way wider—and reputations are damaged by things like that, and that was a powerful statement.  'She can't be trusted' are powerful words.  That's also what was in the document sitting in front of the manager that was interviewing me.  Every single person interviewing me knew that I couldn't be trusted if they read the materials in the packets, or if Peter's words had rung out through the senior leadership of the organization.  So my answer.  Yes, I do believe Peter had a tremendous impact on whether or not I got that job.

8

Pl. Ex. 87, 36: 3-20.  The positions that Brangman interviewed for were filled in April 2010 by Matt Bruce, a white male, and Faye Morin, a white female.  Brangman does not know who made the decision not to hire her.

During March 2010, Brangman took three sick days on March 10, 19, and 26, took a half day off on March 11, left at 3:00 PM on March 24, and arrived at work at 10:00 AM on March 25 after having a doctor's appointment that morning.  On March 29, 2010, Brockie contacted Human Resources about how to handle her absences.  Tracie Fabian put Brockie in touch with Danlyn Brown, the Senior Employment Practices Partner.  Brown created a coaching e-mail that Brockie sent to Brangman.  In response, Brangman lodged a complaint with Tracy Fabian regarding Brockie's e-mail, noting that she took the time off because she was not well, but continued to work from home.  Fabian met with Brangman and set up a follow-up meeting for April 8, 2010.  This meeting never took place because Brangman went out on short term disability beginning April 1, 2010.

Brangman's short term disability was scheduled for April 1, 2010 to May 13, 2010.  On April 12, 2010, she filed EEOC and Delaware Department of Labor claims alleging discrimination based on race, sex and retaliation.  On May 18, 2010, AstraZeneca's Occupation Nurse Betsy Rizzuto gave her an extension until June 9, 2010, after Brangman submitted additional records from her health care provider.  Near the end of this extended disability period Brangman requested additional leave and received an extension until July 7, 2010.  At some point, Rizzuto told Brangman to call HR.  Brangman assumed that HR wanted to contact her about setting up interviews, but did not call HR.  Two days before her short term disability leave was to end, Brangman sent an e-mail to HR Benefits and copied Betsy Rizzuto saying that she was unable to work due to her disability and asked what documentation she needed to send.

Though Rizzuto responded to this e-mail, Brangman did not see it because she had trouble logging in to her Astra Zeneca account.  Rizzuto e-mailed Brangman telling her to call her the next day.  Brangman sent a third e-mail on July 8, 2010 asking Rizzuto what to send, and Rizzuto again responded the following day asking her to call and discuss it with her.  Rizzuto did not hear from Brangman on July 9 or July 12.  She terminated Brangman's short-term disability benefits on July 13, 2010, effective July 8, 2010 and denied her extension request because she did not have medical documentation to support it.  In the letter terminating the benefits, Rizzuto advised Brangman that if she did not return to work on July 19, 2010, AstraZeneca would conclude that she abandoned her job and would terminate her employment.  On July 19, 2010, Brangman contacted Rizzuto to appeal the decision to terminate her short term disability benefits.  She did not return to work.[3]

On August 16, 2010, the Short-Term Disability Administrative Committee met to discuss Brangman's appeal and decided to uphold its decision.  They sent Brangman a letter explaining that "benefits were paid at least for the length of time reasonably necessary for your condition, according to established guidelines for disability."  On August 18, 2010, Brangman's lawyer wrote to AstraZeneca requesting that AstraZeneca reasonably accommodate her by extending her leave at least until she becomes eligible to apply for long term disability benefits.  Her lawyer followed up again on August 30, and requested a Long Term Disability application.

Rizzuto initiated the long-term disability process for Brangman with MetLife, the claims administrator for AstraZeneca's Long Term Disability Plan ("Plan").  AstraZeneca delegates authority to MetLife to make eligibility determinations under the Plan, and considers itself bound by MetLife's determinations.  When Brangman failed to receive an application in the mail, she

---

[3] AstraZeneca cites to exhibits 5-8 attached to Exhibit U.  However, these were not attached to Exhibit U.

called MetLife directly, and was told that AstraZeneca had initiated the process on her behalf and

had already sent her records.  On September 2, 2010, Rizzuto's records state that AstraZeneca's

senior counsel John Bogan requested that she call MetLife to expedite Brangman's claim.  Pl.

Ex. 53 at 2.  Rizzuto spoke with MetLife on September 3, 2010, and explained why AstraZeneca

denied Brangman's request to extend her short-term disability benefits:  because "the med info

did not support EE [employee] being totally disabled."  Pl. Ex. 81 at 2.  AstraZeneca spoke with

MetLife again on September 8 and 9.  On September 8, 2010 Brangman's attorney e-mailed John

Bogan to ask what Rizzuto has done to initiate the long-term disability process with MetLife, and

what AstraZeneca had already submitted.  Pl. Ex. 72.

On October 8, 2010, MetLife notified AstraZeneca that it denied Brangman's application

for long-term disability benefits because of insufficient medical documentation.  On October 15,

2010, AstraZeneca terminated Brangman because she was no longer on approved leave status,

her position had been eliminated, and she did not find another position within the company.  On

March 2, 2011, MetLife upheld its decision upon appeal review because "the medical records

contained in Ms. Brangman's claim file did not support a global psychiatric impairment that

would preclude her from performing her own occupation."  Pl. Ex. 80 at 2.  She has been too

sick to work since leaving AstraZeneca.  Her current source of income is through her personal

long-term disability policy with UNUM.

## II.    LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . .

." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claims. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III.   DISCUSSION

### A.  Title VII Retaliation Claim

In Counts III and IV of her Complaint, Brangman claims that Brockie and AstraZeneca retaliated against her after she engaged in three instances of protected activity under Title VII: when she filed an internal complaint to AstraZeneca about Brockie's treatment in August 2009, when she made a whistleblower report on January 29, 2010 to AstraZeneca's compliance

department regarding a slide she believed violated federal anti-kickback laws, and on April 12, 2010 when she filed an EEOC charge of discrimination and Delaware Department of labor charge. She claims that in retaliation for these actions, her position was eliminated, she was not hired for either job that she applied for, and Brockie retaliated against her by increasing her workload, grading her as "partially met" on her year-end 2009 performance review, interfered with her projects, shunned her socially by excluding her from a Christmas party, complimented male counterparts on their work and her on room set-up, and complained about and monitored her attendance. She also claims that AstraZeneca retaliated against her by denying her short-term disability benefits, interfering with her application to receive long-term disability benefits, and terminating her in October 2010.

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3. In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected employee activity; (2) she suffered an adverse employment action either after or contemporaneous with the employee's protected activity; and (3) a causal connection exists between the employee's protected activity and the employer's adverse action. *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

AstraZeneca concedes that Brangman's August 2009 internal complaint about Brockie is a protected activity. So too is her EEOC filing in April 2010. *See Slagle v. Cnty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006) (finding that a facially valid EEOC complaint alleging Title VII discrimination constitutes a protected activity). Her whistleblower report to compliance,

however, is not.  Title VII's anti-retaliation provisions protect employees who oppose

employment practices made illegal by Title VII.  *Curay-Cramer v. Ursuline Acad. of

Wilmington, Del., Inc.*, 450 F.3d 130, 134-35 (3d Cir. 2006).  The plaintiff must therefore be

opposing unlawful discrimination by expressing their criticism.  *Moore v. City of Phila.*, 461

F.3d 331, 343 (3d Cir. 2006).  Brangman's report to compliance concerned a violation of the

federal anti-kickback law, not conduct made unlawful by Title VII.  Therefore the report is not a

protected activity, and I will grant AstraZeneca's motion for summary judgment as to

Brangman's claim that she was retaliated against under Title VII for her whistleblower report to

compliance.

This leaves the August 2009 internal complaint and April 2010 EEOC filing as

Brangman's protected activities.  In the context of a retaliation claim, an adverse employment

action is one that "might have dissuaded a reasonable worker from making or supporting a

charge of discrimination."  *Burlington N. & Santa Fe Ry Co. v. White,* 548 U.S. 53, 68 (2006).

The Supreme Court distinguished between "material adversity" and "trivial harms."  *Id.*  Title

VII's antiretaliation provision prohibits employer actions that deter employees from making

complaints of discrimination.  *Id.*  "[N]ormally, petty slights, minor annoyances, and simple lack

of good manners will not create such deterrence."  *Id.*

AstraZeneca's motion for summary judgment on Brangman's Title VII retaliation claim

concerning her August 2009 internal complaint of discrimination by Brockie is denied.

Following her August 2009 complaint, Brangman alleges that Brockie retaliated against her by

increasing her workload in September 2009, slighting her contributions, excluding her from a

dinner and giving her a "partially met" performance review in December 2009, interfering in her

work during January 2010, monitoring her in February 2010, and influencing the elimination of

14

her position in March 2010.  While many of these activities lack close temporal proximity to the August 2009 internal complaint, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" of retaliation.  *Kachmar v. SunGuard Data Syst., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).  In addition, the proffered evidence, looked at as a whole, may suffice to raise the inference of retaliation.  *Id.*  As a result, genuine issues of material fact exist regarding whether Brockie's treatment of Brangman following her complaint and her position elimination set forth a prima face case of retaliation.

Brangman alleges that after she filed an EEOC charge of discrimination on April 12, 2010, AstraZeneca retaliated against her by (a) denying her short term disability, (b) terminating her employment, and (c) causing MetLife to deny her long term disability.  Pl. Opp. at 47.  I will deny AstraZeneca's motion as to the first part of the claim because genuine issues of material fact exist concerning the motivations for the denial of Brangman's short term disability extension.  I will grant the motion concerning the other two parts of the claim.  Because I find *infra* that there is insufficient evidence to demonstrate that AstraZeneca influenced or controlled MetLife's decision regarding Brangman's long term disability benefits, I will grant AstraZeneca's motion for this portion of the claim.  Brangman's termination in October 2010 cannot constitute retaliation because the decision to eliminate her job was made back in March 2010, before Brangman filed the EEOC charge.  Thus, there cannot be a causal connection between her protected activity and that adverse employment decision.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).  As a result, only Brangman's claim that AstraZeneca retaliated against her for filing an EEOC charge by denying her short term disability will survive.

### B.  ADA Discrimination Claim

Brangman alleges that AstraZeneca discriminated against her in violation of the ADA and Delaware Persons with Disabilities Employment Protection Act (Counts VII and VIII) by failing to accommodate her after denying a third extension for short term disability leave, and by requiring her to return to work without any accommodation or interactive process.  Pl. Response at 41-42.  She argues that AstraZeneca should have accommodated her by providing her a different position in the company.  *Id.* at 42.  AstraZeneca moves for summary judgment because it contends that Brangman cannot establish a prima facie case of disability discrimination because she was not a qualified individual under the ADA, or alternatively, that the only accommodation she sought was not reasonable.  Because I find that her requested accommodation is not a reasonable accommodation, I will grant AstraZeneca's motion for summary judgment on Brangman's disability discrimination claim.

  To establish a prima facie case of discrimination a plaintiff must show: "(1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).  A "qualified individual" under the ADA is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The EEOC regulations have a two part inquiry: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. § 1630.2(m); *Buskirk v. Apollo Metals*, 307 F.3d

160, 168 (3d Cir. 2002).  AstraZeneca does not dispute that Brangman had the requisite

qualifications for the position she held.  It argues instead that she could not perform the essential

functions of the position with or without a reasonable accommodation.

The ADA specifically provides that an employer discriminates against a qualified

individual with a disability when the employer fails to "make reasonable accommodations to the

known physical or mental limitations of the individual unless the employer can demonstrate that

the accommodation would impose an undue hardship on the operation of the business of the

employer." *Williams v. Phila. Hous. Auth. Police Dep't.*, 380 F.3d 751, 761 (3d Cir. 2004)

(quoting *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999) (internal quotation

marks omitted)).  "Reasonable accommodation" also requires the employer to communicate with

the employee through what is termed the "interactive process."  *Id.* (citing *Mengine v. Runyon,*

114 F.3d 415, 416 (3d Cir.1997)).

The plaintiff bears the burden of identifying a reasonable accommodation.  *Skerski v.*

*Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001).  Brangman argues that AstraZeneca

should have accommodated her either by granting her additional disability leave, or by offering

her another position in the company.  Granting her additional leave in this instance would not

constitute a reasonable accommodation.  There is no evidence that Brangman's leave would have

been temporary.  On the contrary, after she was denied the extension on her short term disability

leave, she applied for long term disability benefits.  Pl. Exs. 66, 68.  As of the date of her

deposition, she maintains she has not been able to work.  Pl. Ex. 87 417:5-10.  Federal courts

have permitted a leave of absence as a reasonable accommodation under the ADA because

applying the reasonable accommodation at that time would enable the employee to perform her

essential job functions in the near future.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d

135, 151 (3d Cir. 2004) *holding modified by Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009). The ADA does not require employers to grant indefinite or open ended disability leave under the ADA. *Krensavage v. Bayer Corp.*, No. 02:04cv1476, 2006 WL 2794562, at *11 (W.D. Pa. Sept. 27, 2006); *Fogleman v. Greater Hazleton Health Alliance*, 122 F. App'x 581, 586 (3d Cir. 2004). Therefore Brangman's request for indefinite leave is not a reasonable accommodation.

Although Brangman argues in her response to AstraZeneca's summary judgment motion that "a reasonable accommodation would have been to offer to switch her position within the company," there is no evidence in the record that she ever made such a request. In fact, there is evidence that she may have prevented AstraZeneca from presenting her with this option. Two days before her short term disability leave was to end, Brangman sent an e-mail to HR Benefits and copied Betsy Rizzuto saying that she was unable to work due to her disability, and noted that she had not contacted HR to set up interviews. Brangman Dep. 329:10-19. Brangman explained in her deposition that she assumed that HR had been attempting to contact her through Rizzuto in order to set up interviews for other jobs. *Id.* 330:1-7; 331:7-9. Brangman stated that she did not contact HR because she "was in no position to call HR or to talk to HR," and she said, "I can't interview and I don't—therefore, there's really no reason to talk to HR." *Id.* 329:24, 330:1-4. Even if AstraZeneca had been attempting to find another position for Brangman in the company, she rebuffed their efforts. She cannot argue now that AstraZeneca failed to accommodate her by not finding her a new position. Because Brangman cannot suggest a reasonable accommodation, her *prima facie* case fails. Therefore I will grant AstraZeneca's motion for summary judgment for Brangman's disability discrimination claims (Counts V and VI).

### C.  ADA Retaliation Claim

Just as in a retaliation claim under Title VII, a retaliation claim under the ADA requires the plaintiff to show (1) a statutorily protected activity; (2) an adverse employment action by the employer; and (3) a causal link between the protected activity and the adverse action.  *Krouse v. Am. Sterlizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997).  In her response, Brangman makes general assertions as to the ways AstraZeneca violated the ADA—by denying her third short term disability extension, denying her attorney's request for a reasonable accommodation, placing her on unpaid status after her short term disability extension was denied, and by influencing MetLife's decision regarding her long term disability request.  Pl. Opp. at 49-50.  Devoid from this discussion is any reference to the record, or any citations to case law.  It is Brangman's burden to demonstrate what specifically constituted her protected activity in the scenario, and the adverse action that was causally connected to it.  She fails to do so.  Because she fails to demonstrate a prima facie case, I will grant AstraZeneca's motion for the disability retaliation claims (Counts VII and VIII).

### D.  Delaware Discrimination Employment Act and Retaliation Claims

AstraZeneca moves for summary judgment on Counts II and IV of Brangman's Complaint because it claims she is barred from seeking remedies provided by Title VII and also by the Delaware Discrimination in Employment Act ('DDEA").  For this proposition, it cites two District of Delaware cases from 2007 that held that a plaintiff who files a Title VII claim is precluded from concomitantly pursuing state law claims under the DDEA, pursuant to 19 Del. C. § 714(c).  *Schlifke v. Trans World Entm't Corp.*, 479 F. Supp. 2d 445, 450 (D. Del. 2007); *Blozis v. Mellon Trust of Del. Nat. Ass'n*, 494 F. Supp. 2d 258, 270 (D. Del. 2007).  Brangman relies on a 2011 District of Delaware opinion concluding the opposite based on the legislative history of

the DDEA.  *Alred v. Eli Lilly and Co.*, 771 F. Supp. 2d 356 (D. Del. 2011) (finding that 19 Del. C. § 712(b)'s clause that "[t]his subchapter shall afford the sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies" was directed at limiting or eliminating common law claims when a claimant pursues a statutory remedy under the DDEA). Based on the analysis in *Alred*, I conclude that Brangman may bring both DDEA and Title VII claims.[4]  Accordingly, AstraZeneca's motion for summary judgment based on this reasoning as to Counts II and IV is denied.

### E.  Delaware Whistleblowers' Protection Act Claim

Brangman claims that AstraZeneca violated the Delaware Whistleblowers' Protection Act through its intentional and willful retaliation, mistreatment, unfair evaluation, by belittling her, and eliminating her position following her report to compliance about the slide Brockie used that she believed broke the law.  Compl. ¶ 115.  AstraZeneca moves for summary judgment on this claim on the basis that this Court lacks jurisdiction, and that Brangman cannot demonstrate that the primary basis for her termination was because she undertook a protected act.

The Delaware Whistleblower's Protection Act provides that

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment:

(4) Because the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, unless the employee knows or has reason to know that the report is false. Provided, however that if the report is verbally made, the employee must establish by clear and convincing evidence that such report was made.

---

[4] Courts interpret DDEA claims under the same framework used to evaluate Title VII claims. *Spady v. Wesley Coll.*, Civ. A. 09-834, 2010 WL 3907357 (D. Del. Sept. 29, 2010).

DEL. CODE ANN. tit. 19, § 1703 (2004).  The burden of proof is on the employee "to show that

the primary basis for the discharge, threats, or discrimination alleged to be in violation of this

chapter was that the employee undertook an act protected pursuant to § 1703." DEL. CODE ANN.

tit. 19, § 1708 (2004).

> AstraZeneca claims this Court does not have jurisdiction because the Act states that

> An action commenced pursuant to subsection (a) of this section may be brought in Superior Court in the county where the alleged violation occurred, the county where the complainant resides, or the county where the person against whom the civil complaint is filed resides or has their principal place of business.

DEL. CODE ANN. tit. 19, § 1704 (West).  While this provision describes in which counties a

plaintiff can bring an action, it does not establish exclusive jurisdiction in Delaware Superior

Court, as evidenced by the use of the word "may."  Furthermore, other district courts have

retained jurisdiction over claims brought under the act.  *See, e.g., Jordan v. Town of Milton*,

CIV.A. 11-00514-GMS, 2013 WL 105319 (D. Del. Jan. 3, 2013); *Curlett v. Madison Indus.*

*Servs. Team, Ltd.*, 863 F. Supp. 2d 357 (D. Del. 2012).  Therefore jurisdiction over this claim is

proper pursuant to 28 U.S.C. § 1367.

> Next, AstraZeneca argues that Brangman's claim should be dismissed because she cannot

demonstrate that Brockie knew that she made the complaint to compliance.  However, there is

evidence that Brockie knew that Brangman discovered the mistake before she went to the

Compliance Department, because the presenter who fixed the slide e-mailed Brockie and copied

Brangman to inform them that he had deleted the slide "as per Debbie's request re compliance."

*Id.* 227:11-15; Pl. Ex. 22.  Though the Compliance Department may have kept Brangman's

subsequent complaint anonymous, there is a genuine issue of material fact as to whether Brockie

knew that she made the complaint anyway.  Therefore I will deny AstraZeneca's motion for

summary judgment for Brangman's whistleblower claim (Count IX).

**F.  ERISA:  AstraZeneca's Influence on MetLife's Benefits Decision**

Brangman brings a claim against AstraZeneca for violating the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), by influencing the Plan Administrator, MetLife, to deny her benefits under the AstraZeneca Long Term Disability Insurance Plan (the "Plan").  AstraZeneca counters that it delegated discretionary authority to MetLife, making MetLife the claims administrator of the Plan.  Def. Mot. at 60; Def. Ex. V, Ex. 1 at 61. AstraZeneca therefore considers itself bound by MetLife's determinations.  Def. Ex. V ¶ 5.  It argues that this claim is properly brought against MetLife, and not AstraZeneca.  Def. Mot. at 60.

Though neither party cites to any case law, it appears that AstraZeneca is arguing that it is an improper party to the ERISA action.  When considering if an employer is a proper party for an ERISA action, the court must look first to whether an administrator has been appointed.  *Rossi v. Boston Gas Co.*, 833 F. Supp. 62, 67 (D. Mass. 1993) (citing *Reynolds v. Bethlehem Steel Corp.*, 619 F. Supp. 919, 928 (D. Md. 1984)).  "If so, the administrator, rather than the employer, is the proper party, not the employer, unless the employer has controlled or influenced the administrator's decision in regard to awarding pension benefits."  *Id.; see also Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988), *cert. denied,* 488 U.S. 826 (1988); *Adamo v. Anchor Hocking Corp.*, 720 F. Supp. 491, 498 (W.D. Pa. 1998); *Foulke v. Bethlehem 1980 Salaried Pension Plan,* 565 F. Supp. 882 (E.D.Pa.1983); *Marcum v. Zimmer,* 887 F. Supp. 891, 894 (S.D.W. Va. 1995) (collecting cases).  The burden is on the plaintiff to demonstrate that the plan administrator's decision to deny benefits was infected by the employer's influence.  *Merritt v. Int'l Bus. Machines Corp.*, CIV A 96-4495, 1997 WL 1136693 (D.N.J. Apr. 4, 1997).

Courts have found plaintiffs to have met this burden when there is sufficient overlap between the employer and plan administrator such that it becomes a de facto plan administrator.

22

*See Law v. Ernst & Young*, 956 F.2d 364, 373-74 (1st Cir. 1992) (where the employer appointed members to the administrator committee, agreed to indemnify members, paid expenses for administration of the plan, and the committee used employer stationary without distinguishing itself from the employer); *Rosen v. TRW, Inc.*, 979 F.2d 191, 192-93 (11th Cir. 1992) (finding motion to dismiss improperly granted where plaintiff plead that the administrator committee was "an unincorporated, unfunded, unidentified, inactive entity which is the alter ego of [the employer]").  Two district court cases from Pennsylvania have similarly ruled.  In *Foulke v. Bethlehem*, the court found that plaintiffs met their burden by demonstrating that the employer's vice chairman, who was also chairman of the general pension board, wrote a letter on the employer's letterhead about modification to the pension plan.  *Foulke v. Bethlehem 1980 Salaried Pension Plan,* 565 F.Supp. 882, 883 (E.D.Pa.1983).  In *Adamo*, the district court in the Western District of Pennsylvania found:

> The plan administrator's decision regarding benefits basically reviewed Anchor Hocking's articulated reason for discharge and determined if this reason fell within the plan's criteria. Moreover, Anchor Hocking revised the severance plan in January 1985 in an effort to clarify its ambiguities. This revision was done by the plan administrator in his capacity as senior labor attorney and vice president of human resources. These facts lead us to conclude that the plan was being controlled and influenced, to a degree, by Anchor Hocking. Accordingly, we find Anchor Hocking a proper party defendant in this case.

*Adamo*, 720 F. Supp. at 498.

Here the plan vests the authority to administer and make decisions regarding claims for benefits to the insurer of the Long Term Disability plan, MetLife.  Def. Ex. V, Ex. 1 at 61. Though she makes no citations to the record, Brangman argues that AstraZeneca is liable nonetheless because it interfered with MetLife's independent determination and influenced MetLife's decision-makers.  Pl. Opp. at 62.  Evidence from the record reveals only the following:  that AstraZeneca Nurse Betsy Rizzuto initiated Brangman's application for long term

disability for MetLife at Brangman's request, sent MetLife the medical documentation it had on file for Brangman, and that Rizzuto spoke with MetLife on the phone.  Pl. Ex. 87 358:14-22; 365:16-18, 397:1-8; Pl. Ex. 81 at 2, 6.  According to MetLife's records, Rizzuto spoke with them on September 3, 2010 and explained why AstraZeneca denied Brangman's short term disability benefits—because the "med info did not support EE [employee] being totally disabled."  *Id.* at 2.  According to Rizzuto's own records, AstraZeneca's senior counsel John Bogan requested that she have MetLife expedite Brangman's claim on September 2, 2010.[5]  Pl. Ex. 53 at 2.  On September 8, 2010 Brangman's attorney e-mailed John Bogan to ask what Rizzuto has done to initiate the long term disability process with MetLife, and what AstraZeneca had already submitted.  Pl. Ex. 72.  This evidence is insufficient to demonstrate control or influence over MetLife's decision process.  The fact that Rizzuto explained to MetLife why AstraZeneca did not give Brangman an extension for short term disability alone does not call into question MetLife's own independent process for Brangman's long term disability status.  No employees of AstraZeneca overlapped as decision-makers for MetLife.  Therefore I will grant AstraZeneca's motion for summary judgment for Brangman's ERISA claim.

---

[5] In Plaintiff's Opposition she argues that AstraZeneca's Senior Counsel John Bogan "was filing position papers opposing Brangman's discrimination and retaliation claims filed with the EEOC," while at the same time "heavily involved in AstraZeneca's denial of Brangman's short term disability benefits, in constant communication with AstraZeneca Nurse Betsy Rizzuto, and also communicating and interfering, through Nurse Rizzuto, with MetLife. . .".  Pl. Opp. at 9-10. The only actual evidence from the record, that Bogan told Rizzuto to call MetLife to expedite Brangman's application, is not sufficient to show that he controlled or influenced MetLife's decision.

**IV.     CONCLUSION**

For the above stated reasons I will grant in part and deny in part AstraZeneca's motion

for summary judgment.


_____/s/ Anita B. Brody_____

ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: