IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBORAH BRANGMAN, : | |
| Plaintiff, : | |
| : | CIVIL ACTION |
| v. : | NO. 12-351 |
| : | |
| ASTRAZENECA, LP, ASTRAZENECA : | |
| PHARMACEUTICALS, LP and : | |
| METROPOLITAN LIFE INS. CO. : | |
| PARTNERS, LP, et al., : | |
| Defendants. : | |

**June 24, 2013**                                                                                                         **Anita B. Brody, J.**

**MEMORANDUM**

Plaintiff Deborah Brangman brings suit against Defendant Metropolitan Life Insurance Co. ("MetLife") for its adverse determination of her claim for long-term disability (LTD) benefits under the AstraZeneca Long Term Disability Insurance Plan (the "Plan"). The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. MetLife moves for summary judgment on the grounds that its determination was reasonable, proper, and based on substantial evidence in the administrative record, and that Brangman was not entitled to LTD benefits. MetLife subsequently moved to strike portions of Brangman's statement of undisputed facts and certain exhibits because they reside outside of the administrative record.[1] Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§

---

[1] Specifically, MetLife seeks to strike paragraphs 1 through 65, 67-68, 70 and 73 of Plaintiff's Statement of Undisputed Facts (ECF Doc. 49, pp. 30-44) and strike Exhibits 4-10 (ECF Docs. 48-5 to 48-11); 12-17 (ECF Docs. 48-13 to 48-18); 20-24 (ECF Docs. 48-21 to 48-25); 26-35 (ECF Docs. 48-27 to 48-36); 38-63 (ECF Docs. 48-39 to 48-64); 65-75 (ECF Docs. 48-66 to 48-76); 78 (ECF Doc. 48-19); 82-85 (ECF Docs. 48-83 to 48-86); 87-91 (ECF Docs. 48-88 to 48-

1

1132. For the reasons set out below, I will grant MetLife's Motion for Summary Judgment and deny MetLife's Motion to Strike.

## I. BACKGROUND

Plaintiff Deborah Brangman was employed at AstraZeneca Pharmaceuticals, LP ("AstraZeneca") as a Marketing Skills Development Director. Brangman filed a lawsuit against AstraZeneca alleging that it discriminated and retaliated against her. She stopped working at AstraZeneca as of April 1, 2010, and went out on short term disability leave for anxiety and depression. She received extensions for her short term disability leave until July 8, 2010. When her request for another extension was denied by AstraZeneca, she sought to apply for LTD benefits through AstraZeneca's insurer, MetLife.

As an employee of AstraZeneca, Brangman was a participant in the Plan, an employee welfare benefit plan governed by ERISA. The Plan is funded through a group policy issued by MetLife to AstraZeneca. Although AstraZeneca is the Plan administrator, it delegated the authority to administer and decide claims for benefits to MetLife. Def's. App. of Exs. at 059. The Plan dictates that

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the plan and to determine eligibility and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the Interpretation or determination was arbitrary and capricious.
>
> The Plan Administrator may delegate any or all of this authority to a third party, including the claims or benefits administrators designated under the Plan. To the extent that the Plan Administrator has delegated such authority, the third party or the claims or benefits administrator has all the powers and responsibility of the Plan Administrator.

---

92); 93 (ECF Doc. 48-94); 100 (ECF Doc. 48-96) and 102 (ECF Doc. 48-98) from Plaintiff's Response to MetLife's Motion for Summary Judgment.

>The authority to administer and decide initial and continuing claims for benefits has been delegated to the Insurer that Insures the Plan.

*Id*. Relevant provisions of the Plan provide that:

- A claimant is to provide "Proof," or "Written evidence satisfactory to [MetLife] that a person has satisfied the conditions and requirement for any benefit described in this certificate." Def's. App. of Exs. at 26.

- "Disability" means that due to sickness or the result of an accidental injury, "[y]ou are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and [y]ou are unable to earn during the Elimination period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisabiilty Earnings at Your Own Occupation for any employer in Your Local Economy. . ." *Id.* at 023.

- "Local Economy" "means the geographic area within which You reside; and which offers suitable employment opportunities within a reasonable travel distance." *Id.* at 024-025.

- For a "Disability Due to Mental or Nervous Disorders or Diseases," MetLife "will limit Your Disability benefits to a lifetime maximum equal to the lesser of 24 months; or the Maximum Benefit Period." *Id.* at 043. "[MetLife] will determine if a Disability is the result of a Mental or Nervous Disorder or Disease." *Id.*

- "'Mental or Nervous Disorder or Disease' means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic And Statistical Manual of Mental Disorders as of the date of Your Disability. A condition may be classified as a Mental or Nervous Disorder or Disease regardless of its cause." *Id.* at 043.

On August 31, 2010, AstraZeneca's Occupational Health Nurse Betsy Rizzuto initiated the process for Brangman to apply for LTD benefits with MetLife. Def's. App. of Exs. at 368. MetLife sent Brangman a letter informing her that it received her claim request. On her Long Term Disability Claim Form, Brangman stated that she could no longer do her job due to anxiety, lack of focus, and depression. *Id.* at 295. On September 2, 2010, Rizzuto's records state that AstraZeneca's senior counsel John Bogan requested that Rizzuto call MetLife and expedite Brangman's claim.[2] On September 3, 2010, MetLife wrote to Brangman requesting additional

---

[2] Nurse Rizzuto's records are not part of the administrative record. They were submitted by Plaintiff as Exhibit 53, along with other exhibits that were submitted as part of Plaintiff's

documents, including her medical office visit notes, progress and/or therapy notes, and any test results related to her condition by October 2, 2010. *Id.* at 345. Also on September 3, MetLife spoke with Rizzuto, who explained that AstraZeneca denied Brangman's request to extend her short-term disability benefits because "the med info did not support EE [employee] being totally disabled." *Id.* at 062.

On September 8, 2010, a MetLife Claims Specialist spoke with Brangman on the phone. Brangman asked if AstraZeneca's denial of her short term disability benefits and appeal would affect her LTD benefits determination, and the Claims Specialist stated that "LTD would most likely [sic] be a separate review and we will review the med info that we obtain." Def's. App. of Exs. at 065. MetLife asked AstraZeneca to send it Brangman's job description.

On September 14, 2010, MetLife sent Brangman a letter that it had been trying to reach her unsuccessfully, and that she should call it back. MetLife also requested that Brangman's healthcare providers, Jeffrey Landsman, MSW, LSW and Dr. Steven Zavodnick provide office notes and test results from March 2010 to present. On September 24, 2010, MetLife conducted a

---

discrimination claims against her employer Astra Zeneca. Defendant has moved to strike all exhibits submitted by the Plaintiff that are not a part of the administrative record. Generally, a court reviewing a decision under the arbitrary and capricious standard of review is limited to the administrative record that was available to the administrator when the decision was made. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997). The Third Circuit has carved out exceptions: when a court needs to look outside the record to explain medical terms, or when a plaintiff alleges bias or conflict of interest that affected the decision. *Howley v. Mellon Financial Corp.,* 625 F.3d 788, 793 (2010); *Kosiba*, 384 F.3d at 69; *See also Murray v. IBEW Local Union No. 98 Pension Plan*, CIV. A. 10-3852, 2011 WL 1883168 (E.D. Pa. May 17, 2011). The Third Circuit found that this exception remains appropriate post *Metro Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) ("*Glenn*"). *Howley,* 625 F.3d at 793. Plaintiff argues its exhibits should be considered because they show that AstraZeneca influenced MetLife's decision. Therefore, I will consider Plaintiff's exhibits that are outside of the record only to evaluate Plaintiff's alleged conflict of AstraZeneca's influence on MetLife. Any exhibits that do not relate to this conflict and were not included in the administrative record will not be considered. Defendant's Motion to Strike is therefore denied.

phone interview with Brangman, who stated that her primary diagnosis is Major Depressive Disorder and Anxiety.

      MetLife received records from Dr. Zavodnick, her psychiatrist, Mr. Landsman, her therapist, and Dr. John Steers, her cardiologist.  Dr. Steers provided records that stated that Brangman's stress echocardiogram and EKG were normal.  Dr. Zavodnick's primary diagnosis for Brangman was major depression with a secondary diagnosis of post-traumatic stress disorder.  He advised Brangman not to return to work because of a "hostile work environment" and "legal action pending."  Def's. App. of Exs. at 307.  He noted that she was "able to engage in only limited stress situations and engage in only limited interpersonal relations," "not as to current work setting." *Id.*  He prescribed her Xanax, Aderall, Ambien and Lexapro for her condition.

      Mr. Landsman sent MetLife office visit notes for Brangman from June 6, 2010 through September 27, 2010.  On her first visit, Landsman noted that her appearance and affect were appropriate, she was alert and oriented, her memory and reasoning were good, and her judgment was poor.  She reported depressed mood, intrusive thoughts, difficulty sleeping, fatigue, paranoia, anhedonia, panic attacks, decrease in self-esteem, and difficulty focusing.  In her following session, Landsman noted that her judgment had gone from poor to fair, but that she was withdrawn with slow speech.  In her July sessions he noted her hyper-vigilance bordered on paranoia, and that she had panic attacks when dealing with mail from AstraZeneca, and anxiety surrounding her disability paperwork.  On August 16, 2010, he noted that she had improved, but on the following session on August 23 remarked that she had lost ground when dealing with her disability claim with AstraZeneca.  In September she experienced heart palpitations and went to the emergency room when AstraZeneca contacted her about a severance package and when she learned that AstraZeneca had sent MetLife her information, which she believed was a violation

5

of her privacy. In her last reported session with Landsman on September 27, he noted that her judgment and reasoning were good and that she overcame significant anxiety to conduct the phone interview with MetLife. He noted that she is still dealing with a loss of identity and she feels violated and betrayed.

On October 8, 2010, MetLife sent Brangman a letter denying her claim for LTD benefits. MetLife wrote that in her most recent office visit note with her therapist he stated that "[her] mental status at this time was entirely within normal limits inclusive of cognitive, affective and behavioral realms." MetLife concluded

> In summary, your most recent mental status exam was normal and the medical information reviewed at this time reflects issues with your specific work environment and does not support a global functional impairment that would preclude you from performing your own occupation with any employer as the Plan states. Therefore your claim has been denied.

Def's. App. of Exs. at 224. MetLife advised Brangman that for claim reconsideration, she could provide medical documentation that supports a functional impairment that would prevent her from performing her occupation, including office visit notes and test results from her healthcare providers. She could also appeal the decision, by providing the reasons she believes the claim was improperly denied, and by submitting additional records to MetLife.

On December 15, 2010, Brangman appealed MetLife's decision through her attorney. Her attorney argued that MetLife disregarded Zavodnick and Landsman's diagnoses, and cherry-picked Landsman's office visit note on September 27 where he stated her mood was "content" while ignoring his other notes that described her as depressed, anxious and irritable. Her attorney asserted that Brangman's condition would not return to normal at a different place of work, backed up by a November 21, 2010 letter from Landsman. He concluded that MetLife used an incorrect job description for Brangman, and that AstraZeneca influenced MetLife when

AstraZeneca's Occupational Health Nurse Betsy Rizzuto had a conversation with MetLife about why Brangman's short term disability benefits extension was denied. Attached was Landsman's November 21 letter, and new office visit notes from October 4, 11, and 18, and November 1, 8 and 15. In these notes he described her as unkempt, sluggish, submissive, with slow speech, a depressed, anxious and irritable mood and fair judgment. She experienced a recurrence of negative feelings triggered by completing the LTD application, a surge in anxiety when she filed additional charges against AstraZeneca, paranoia, distrust, and victimization. On October 18 he wrote that "there is an increase in the [client's] feelings of paranoia based in distrust, which appears to be significant enough to impair her daily functioning." Def's. App. of Exs. at 208. On January 11, 2011, MetLife informed Brangman's attorney that her appeal was being referred for an independent claim review.

MetLife requested that AstraZeneca send it Brangman's job description. AstraZeneca's HR Partner Tracy Fabian explained that there was no "completely current" job description on file for her role because the position was in transition. Def's. App. of Exs. at 178. Fabian and Brangman's supervisor slightly updated her old job description to reflect the work she was doing. MetLife sent Brangman's file to be reviewed by an independent physician consultant, board certified psychiatrist Dr. Marcus Goldman. Dr. Goldman reviewed her file, spoke with Mr. Landsman, and received a voice mail message from Dr. Zavodnick. On January 21, 2011, Dr. Goldman issued an Advisory Report.

According to Dr. Goldman, Dr. Zavodnick stated in the voicemail that Brangman "is dealing with a work situation and until that is resolved [her] symptoms will not resolve. [She] becomes suicidal and ruminative when work issues are brought up. [She] is seen monthly. [Her] issues would be resolved quickly if she were to be offered another position." Def's. App. of Exs.

7

at 149. Dr. Goldman described that Landsman told him Brangman had trouble getting out of bed, trouble sleeping, signs of depression, and hyper-vigilance bordering on paranoia. At times she stayed in her pajamas until noon, wore sweats, and recently was off-base when signing a check and did not know the day of the month. Goldman questioned whether these behaviors were due to the fact that she was not working rather than signs of disability. Landsman disagreed, reiterating that Brangman is depressed. Goldman asked Landsman about Brangman's global functioning. He replied that "her mother had to help her even get the mail but that [she] does drive to sessions." *Id.* at 149. He explained that "[she] wants to return to her baseline functioning and then eventually to some sort of work." *Id.* at 150.

Dr. Goldman concluded that "[t]he medical information does not support functional limitations (psychiatric) beyond March 31, 2010 to the present," because

> [t]he claimant had no active suicidal/homicidal ideation, psychosis, mania, volatility, observable aggression, lethargy, somnolence or impaired sensorium. The data do not support measured cognitive dysfunction, or impairments in activities of daily living. Work conflicts are not tantamount to mental illness.

Def's. App. of Exs. at 148. In his assessment, Dr. Goldman explained that the information in the record was "poorly compelling from a psychiatric perspective" and

> . . .does not objectively, or in any compelling, convincing, or observable fashion support the presence of a mental disorder of such severity as to preclude this claimant for working or functioning. . . Mental status examinations are typically grossly intact and much of the data are subjective and self-reported. Findings on mental status examination in this case are not atypical in cases of those individuals who [sic] feel wrongly treated in the workplace.

*Id.* at 150. He found a diagnosis of post-traumatic stress disorder unsupported, and no evidence that Brangman was so impaired as to be precluded from functioning on a global scale.

On January 25, 2011, MetLife sent Dr. Goldman's report to Landsman and Dr. Zavodnick to give them the opportunity to respond to his comments. Landsman responded on

February 18 by letter disagreeing with Dr. Goldman's conclusions. He noted that Dr. Goldman disregarded Brangman's feelings of depression, and that she meets all of the criteria for a diagnosis of Major Depression Disorder. He also contended that Dr. Goldman did not take into consideration that Brangman's "discrimination and minimization as a woman and a person of color are potentially experienced differently," and "the residual neurological implications of trauma." Def's. App. of Exs. at 132. He concluded that her ongoing anxiety impairs her function. There is no response from Dr. Zavodnick contained in the Administrative Record.[3]

On March 2, 2011, MetLife sent a letter to Brangman's attorney advising her that it decided to uphold its decision on appeal. MetLife's psychiatric clinical staff reviewed Landsman's objections to Dr. Goldman's conclusions and determined that Landsman did not

---

[3] Plaintiff's Exhibit 78 is a Declaration by Dr. Zavodnick from March 2011 stating that he drafted and sent a letter to MetLife on February 2, 2011. Ex. 78 at 1. In the letter he explains that Brangman had been under his care since December 2008, fit the full DSM criteria for Major Depression when she initially presented, and her condition became worse when her workplace environment became hostile. Ex. 78 at 2. He stated that he did not tell Dr. Goldman that things would resolve quickly for Brangman if she were offered another job. *Id.* He wrote, "I do not feel that any job with her current employer would result in the sense of lasting security that would be necessary to bring this about." *Id.* He disagreed with Dr. Goldman's assessment that Brangman is not seriously impaired and questioned Dr. Goldman's call for objective findings because mood and anxiety disorders are "subjective phenomena, usually without dramatic observable or laboratory findings." *Id.*

This letter is not present in MetLife's administrative record, and was not referenced in MetLife's letter denying Brangman's appeal. *See* Def's. App. of Exs. at 127-28. It does not fit either of the Third Circuit's exceptions for evidence that can be considered outside of the record as described in note 2, *infra*: when a court needs to look outside the record to explain medical terms, or when a plaintiff alleges bias or conflict of interest affected the decision. *Howley v. Mellon Financial Corp.,* 625 F.3d 788, 793 (2010); *Kosiba*, 384 F.3d at 69. Without additional evidence that the absence of the letter was intentional on the part of MetLife, which would constitute a procedural irregularity, Exhibit 78 is not considered as part of the record. Even if I did consider Exhibit 78, its contents are insufficient to deem MetLife's decision arbitrary and capricious. Dr. Zavodnick's statement that he did "not feel that any job with her *current employer*" would resolve Brangman's problems is consistent with MetLife's finding that the severity of Brangman's condition was not so great that she would be unable to perform her job for a different employer.

9

provide any new clinical finding that were not previously considered by Dr. Goldman. MetLife concluded

> [A]lthough Ms. Brangman's treating providers report that she continues with a significant mental health disorder, which they feel render her disabled, there is no supporting clinical medical documentation that Ms. Brangman's condition was at the level of impairment as to prevent her from functioning successfully at her own sedentary occupation as a marketing skills development director as of April 1, 2010.

Def's. App. of Exs. at 128. The letter reiterated Dr. Goldman's findings that her mental status examinations were typically intact, the data was subjective and self-reported, she had no active suicidal/homicidal ideation, and that the data did not support measured cognitive dysfunction or impairments in activities of daily living.

> In summary, benefits must be administered in accordance with the employer's plan and this requires that the disability be defined and medically substantiated on a continuous basis by Ms. Brangman's providers with comprehensive clinical and specific information. The medical records on file do not support a severity of impairment that would result in Ms. Brangman's inability to perform work as defined above as of April 1, 2010.

*Id.* at 128-29. No further administrative appeals were available.

## II.     STANDARD OF REVIEW

The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If a plan gives the administrator or fiduciary discretionary authority to make eligibility determination, then an "abuse-of-discretion" or "arbitrary and capricious" standard is appropriate. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105,

111 (2008).[4]  "Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan." *Id.* (quoting *Luby v. Teamsters Health, Welfare, & Pension Trust Funds*, 944 F.3d 1176, 1180 (3d Cir. 1991)).  Discretionary powers may be implied or express.  *Luby,* 944 F.3d at 1180.  Here, they are express.

Under the heading "Discretionary Authority of Plan Administrator and Other Plan Fiduciaries," the Plan states:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the plan and to determine eligibility and entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the Interpretation or determination was arbitrary and capricious.
>
> The Plan Administrator may delegate any or all of this authority to a third party, including the claims or benefits administrators designated under the Plan.  To the extent that the Plan Administrator has delegated such authority, the third party or the claims or benefits administrator has all the powers and responsibility of the Plan Administrator.
>
> The authority to administer and decide initial and continuing claims for benefits has been delegated to the Insurer that Insures the Plan.

Def's. App. of Exs. at 059.  The insurer in this case is MetLife.  *Id.* at 003.

Brangman argues that based on the definition language in the Plan she should be accorded *de novo* review.  "Proof" is defined in the Plan as, "Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate."  Def's. App. of Exs. at 026.  Brangman cites to several District Court opinions for the proposition that this language does not convey MetLife discretionary authority.  *Bair v. Life*

---

[4] The only standards of review available are *de novo* or "arbitrary and capricious" in light of the Supreme Court's ruling in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  Accordingly, the Third Circuit no longer ascribes to the previously used "sliding scale" alternatives of review.  *Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009).

*Ins. Co. of N. Am.*, 263 F.R.D. 219 (E.D. Pa. 2009) (referencing *Farina v. Temple Univ. Health Sys. Long Term Disability Plan*, CIV.A. NO. 08-2473, 2009 WL 1172705 (E.D. Pa. Apr. 28, 2009); *Adams v. Life Ins. Co. N. Am.*, 2009 WL 2394150 (E.D. Pa. Aug. 3, 2009); *Elms v. Prudential Ins. Co. of Am.,* CIV.A. 06-1527, 2008 WL 4444269 (E.D. Pa. Oct. 2, 2008).[5] While this may be true, the Plan gives MetLife discretionary authority through the "Discretionary Authority of Plan Administrator and Other Plan Fiduciaries" section listed above. Through that language, MetLife has been delegated the authority to administer claims for benefits, and "[a]ny interpretation or determination [it makes] shall be given full force and effect, unless it can be shown that the Interpretation or determination was arbitrary and capricious." Def's. App. of Exs. at 059. This plain language vests discretionary authority in MetLife, and therefore requires me to use the arbitrary and capricious standard of review.[6]

Under the arbitrary and capricious standard of review, a court must defer to the administrator unless the administrator's decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012) (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011)). "An

---

[5] The courts in *Farina, Adams* and *Elms* analyzed whether there was implied discretion in plans that lacked express language. *Farina,* 2009 WL 1172705, at *10 (finding that a plan term requiring a claimant to support his claim with satisfactory proof, absent more, fails to confer discretion upon an administrator); *Adams*, 2009 WL 2394150, at *6 (finding that requiring a plan participant to submit "satisfactory proof" of disability to his or her insurance company does not unambiguously convey discretionary authority to the insurance company); *Elms,* 2008 WL 4444269, at *13 (finding that the plan "does not clearly, expressly or even impliedly, reserve discretion for [the insurer] to define when 'Total Disability' exists according to its subjective qualifications").

[6] Prior to *Glenn* the Third Circuit permitted consideration of outside evidence of potential biases and conflict of interest to determine the correct standard of review. *Kosiba v. Merck & Co.*, 384 F.3d 58, 67 n.5 (3d Cir. 2004). Post-*Glenn*, the Third Circuit has held that an administrator's conflict of interest does not alter the standard of review for evaluating its decision to deny benefits. *Howley*, 625 F.3d at 793 (3d Cir. 2010). Instead, the conflict is a factor considered under the arbitrary and capricious standard of review. *Id.*

administrator's interpretation is not arbitrary if it is 'reasonably consistent with unambiguous plan language.'" *Fleisher*, 679 F.3d at 218 (quoting *Bill Gray Enters. v. Gourley,* 248 F.3d 206, 218 (3d Cir.2001)).  It must be upheld unless the decision was "clear error" or not "rational." *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1141 (3d Cir. 1993).  The court's scope of review is narrow; it "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993). While "the arbitrary and capricious standard is extremely deferential, it is not without some teeth.  Deferential review is not no review, and deference need not be abject." *Kuntz v. Aetna Inc.,* Civ.A.No. 10-cv-00877, 2013 WL 2147945, at *4 (E.D. Pa. May 17, 2013) (internal quotations omitted).

Summary judgment is appropriate where "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S 317 (1986).  "Where the decision [of an ERISA-governed plan' to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Davis v. Broadspire Servs., Inc.*, Civ.A.No. 05-5829, 2006 WL 3486464, at *1 (E.D. Pa. Dec. 1, 2006) (quoting *Benedixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir. 1999)).

### III.  DISCUSSION

MetLife argues that that its claim determination must be upheld because it is reasonable, consistent with plan language, and is supported by substantial evidence contained in the administrative record.  Brangman responds that MetLife's denial was improper because of structural conflicts, procedural abnormalities, and because MetLife disregarded medical reports

and opinions of Brangman's treating psychiatrist and therapist. The Third Circuit recognizes two general categories of conflicts: structural conflicts relating to financial incentives inherent in a plan's design, and procedural conflicts that affect how the administrator arrived and its decision. *Sivalingam v. Unum Provident Corp.*, 735 F. Supp. 2d 189, 195 (E.D. Pa. 2010) (citing *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162, 164-65 (3d Cir. 2007)).

### A. Structural Conflict

MetLife concedes that there is a structural conflict because it both pays benefits and evaluates claims. Def's. Mot. to Strike Repl. (ECF No. 58) at 3. This is the same type of conflict the Supreme Court discussed in *Glenn*. The Court concluded that this kind of conflict is "but one factor among many that a reviewing judge must take into account." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. at 116. Therefore I will consider this factor in deciding MetLife's Motion for Summary Judgment.[7]

### B. Procedural Irregularities and Biases

Just as structural conflicts factor into a court's review, so too do procedural irregularities or other evidence of bias. *Glenn*, 544 U.S. at 118 (finding that factor that suggested procedural unreasonableness was important); *Howley,* 625 F.3d at 793-794 (3d Cir. 2010) (noting that a court may consider evidence of potential biases and conflicts of interest not found in the administrator's record); *Shvartsman v. Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson*, CIV.A. 11-3643 JAP, 2012 WL 2118126, at *11 (D.N.J. June

---

[7] The Supreme Court instructed that a structural conflict would be given more weight "in circumstances [that] suggest a higher likelihood that it affected the benefits decision," for example, "where an insurance company administrator has a history of biased claims administration." *Glenn*, 554 U.S. at 117. In contrast, conflicts are less important if "the administrator has taken active steps to reduce potential bias and to promote accuracy" by separating claim administrators from those interested in firm finances, or by imposing impartial management checks that penalize inaccurate decisionmaking. *Id.* Here there is no evidence of either element that would give the conflict more or less weight.

11, 2012) (finding that evidence of procedural abnormalities or other bias is to be considered a factor like a conflict of interest is considered as stated in *Glenn*).

### i. MetLife was improperly influenced by AstraZeneca

Brangman alleges that AstraZeneca inappropriately influenced MetLife's decisionmaking when Rizzuto told MetLife that AstraZeneca denied Brangman's claim for short-term disability because the medical information did not support her being totally disabled. The fact that Rizzuto relayed this information does not demonstrate that MetLife's own review of Brangman's claim was not independent. MetLife requested information directly from Brangman and her healthcare providers. It reviewed the medical records from her healthcare providers, and referenced the information in those records in its decision denying her claim. On appeal, MetLife reviewed additional medical records and sent Brangman's file to be reviewed by an independent consultant. There is no evidence that relaying the reason for denying Brangman's short-term disability extension influenced MetLife's independent review of her LTD claim.

Brangman also argues that AstraZeneca's Senior Counsel John Bogan "participated in MetLife's denial of Brangman's claim." Pl. Resp. at 34. Her only evidence is an entry in AstraZeneca's Nurse Rizzuto's Absence Notes log stating that Bogan requested to have MetLife expedite Brangman's claim. Pl. Ex. 53. This evidence is insufficient to demonstrate that Bogan participated in MetLife's decision in any fashion.

### ii. Procedural Abnormalities

Brangman argues that in contravention to the Plan, Nurse Rizzuto filed Brangman's LTD claim with MetLife and sent her medical records in their possession. The Plan instructs a claimant to obtain a claim form from the Policyholder (AstraZeneca), fill it out, and return the form with required "Proof" to the Policyholder. Def's. App. of Exs. at 046. The Policyholder

then certifies the insurance under the Group Policy and sends the certified claim form and "Proof" to the insurer. *Id.* In this case, Brangman told AstraZeneca that she wanted to apply for LTD benefits. AstraZeneca sent the information it had directly to MetLife, and did not send her a claim form. However, upon receiving AstraZeneca's information, MetLife contacted Brangman directly to ask her to fill out the appropriate forms and provide documentation. Therefore MetLife cured any procedural flaw.

Next Brangman argues that MetLife used an incorrect job description for her. Brangman was a marketing trainer at AstraZeneca. Her exact title and specific duties changed as AstraZeneca changed its structure. Def's. App. of Exs. at 178. When Brangman's attorney complained that MetLife used the wrong job description in her appeal, MetLife contacted AstraZeneca to obtain an accurate version. AstraZeneca updated an older job description that it had on file to reflect her duties. Brangman had originally submitted a resume with her job duties to MetLife and did not change or supplement that submission. An inaccurate job description could affect the outcome of a claim administrator's decision if, for example, it omits job duties that a claimant can no longer perform, such as certain strenuous activities. *See Etkin v. Merk & Co., Inc.*, CIV.A. 00-5467, 2001 WL 134368 (E.D. Pa. Oct. 30, 2001). However, even if the job description was not entirely up to date, it still reflected that Brangman's job duties involved marketing training projects, and that her job was sedentary. Brangman neither explains what was incorrect about the job description MetLife relied upon, nor how an accurate one would change its analysis. Therefore MetLife's decision was not arbitrary and capricious on this basis.

Brangman notes that MetLife made its decisions without receiving or reviewing records from her primary care physician. Brangman does not explain how records from her primary care physician were necessary or would have altered MetLife's decision. Because her disability claim

was based on the diagnoses of her psychiatrist and therapist, their records would be essential. There is no indication that her primary care physician's records would be germane.

When considering her appeal, Brangman argues that MetLife should have given her a physical exam, instead of enlisting Dr. Goldman to review the files.  Although a physical exam could have provided MetLife with useful information, it is not required.  A "paper review" of a claim file is not, by itself, arbitrary and capricious.  *Wernicki-Stevens v. Reliance Standard Life Ins. Co.,* 641 F. Supp. 2d 418, 425 (E.D. Pa. 2009) (citing *Dolfi v. Disability Reinsurance Mgmt. Servs. Co.,* 584 F.Supp.2d 709, 735 (M.D. Pa.2008)).

### iii.  Biases Against her Treating Health Professionals

Brangman maintains that MetLife disregarded the medical reports and opinions of her treating healthcare professionals.  She argues that MetLife's independent consultant provided an inadequate explanation for his findings in his report.  She also argues that MetLife failed to consider Dr. Zavodnick's letter in response to Dr. Goldman's report.  She also accuses MetLife of giving too much weight to Landsman's September 27 office visit note that stated her mood was "content."

To be eligible for disability benefits, a claimant must not be able to perform his or her occupation for any employer in the geographic area where he or she resides.  Much of therapist Landsman's office visit notes describe Brangman's setbacks occurring when she dealt with issues relating to AstraZeneca, her legal action against it, and the process of applying for disability.  Landsman also credited Brangman with exhibiting normal cognitive function over the course of her visits.  Dr. Zavodnick's records noted that Brangman could not return to work in

"her current work setting."[8] Dr. Goldman noted that Brangman's healthcare providers' observations were subjective and not based on objective data. He concluded that the information in her file did "not objectively, or in any compelling, convincing, or observable fashion, support the presence of a mental disorder of such severity as to preclude [her] from working or functioning." Def's. App. of Exs. at 150. The basis of MetLife's denial of her appeal is that her records do not indicate her condition was severe enough to inhibit her from performing her marketing training position for another employer. In its discretion, MetLife chose to ascribe to Dr. Goldman's assessment. Claims administrators need not give special weight to the opinions of a claimant's physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). The claimant's treating physicians do not receive more deference "because the possibility of a conflict of interest is just as real with respect to a treating physician who, "'in a close case, may favor a finding' for the patient." *Dolfi v. Disability Reinsurance Mgmt. Servs., Inc.*, 584 F. Supp. 2d 709, 734 (M.D. Pa. 2008) (quoting *Stratton v. E.I. DuPont De Nemours & Co.,* 363 F.3d 250, 255 (3d Cir.2004) (*quoting Nord,* 538 U.S. at 832, 123 S. Ct. 1965). Choosing to rely on the non-treating medical consultant over the claimant's treating physicians does not render a denial of disability benefits arbitrary and capricious. *Id.* at 734-35. MetLife considered the opinions of the medical professionals and ascribed to the view that Brangman's condition was no so severe so as to impede her from performing her job for any employer. The fact that her condition was intertwined and exacerbated by her interactions with AstraZeneca supports this fact. Therefore I

---

[8] As described in note 4, *infra*, I am not considering in my analysis Dr. Zavodnick's February 2, 2011 letter to MetLife disputing Dr. Goldman's report because the letter is not a part of the administrative record. Even if this letter was part of my consideration, Dr. Zavodnick stated that he did "not feel that any job with [Brangman's] *current employer* would result in the sense of lasting security that would be necessary to [resolve Brangman's problems]." Ex. 78 at 2 (emphasis added). Even if this letter could be considered, it still calls into question whether Brangman could perform a similar job for an entirely different employer.

cannot conclude that MetLife acted in an arbitrary and capricious manner when it decided to deny Brangman's claim for LTD benefits.

## IV.    CONCLUSION

For the above stated reasons I will grant MetLife's motion for summary judgment. I will deny MetLife's Motion to Strike.

_____/s/ Anita B. Brody_____
ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:           Copies **MAILED** on _____ to: