IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Deborah J. Brangman, | : | |
| | : | |
| Plaintiff, | : | Case No. 12-351 |
| | : | |
| v. | : | Honorable Anita B. Brody |
| | : | |
| AstraZeneca, LP and AstraZeneca Pharmaceuticals, LP, | : | FILED VIA ECF |
| | : | |
| Defendants. | : | |

**DEFENDANTS ASTRAZENECA, LP AND ASTRAZENECA PHARMACEUTICALS, LP'S PRE-TRIAL MEMORANDUM**

Defendants AstraZeneca, LP and AstraZeneca Pharmaceuticals, LP (collectively, "AstraZeneca"), by their undersigned counsel, hereby submit their Pretrial Memorandum in accordance with the Court's Amended Scheduling Order of August 30, 2013.

**I.    NATURE OF ACTION AND BASIS OF COURT'S JURISDICTION**

In this case, Plaintiff Deborah Brangman ("Ms. Brangman") claims that AstraZeneca unlawfully discriminated and retaliated against her based on her gender and race in violation of Title VII and the Delaware Discrimination in Employment Act ("DDEA"), by eliminating her position, by failing to offer her either of the two positions for which she subsequently applied, and by subjecting her to various acts of alleged mistreatment. Ms. Brangman also claims that AstraZeneca retaliated against her in violation of the Delaware Whistleblowers' Protection Act ("WPA") following her report to AstraZeneca's Compliance Department about a PowerPoint

slide used during a presentation which she believed violated "the federal anti-kickback law." This Court has original jurisdiction over Ms. Brangman's Title VII claims and supplemental jurisdiction over Ms. Brangman's DDEA and WPA claims.

## II.     ASTRAZENECA'S COUNTER STATEMENT OF FACTS

### A.     Overview of AstraZeneca.

AstraZeneca is a global, research-based biopharmaceutical company that develops, manufactures, and markets prescription medicines for six important areas of healthcare: cancer, cardiovascular, gastrointestinal, infection, neuroscience, and respiratory and inflammation. AstraZeneca currently employs roughly 50,000 people worldwide. Its United States corporate headquarters are located in Wilmington, Delaware.

AstraZeneca maintains an Equal Employment Opportunity Policy, which emphasizes the Company's commitment "to providing equal employment opportunity without regard to race, color, religion, gender, sexual orientation, national origin, age, disability, marital status, veteran status, or other personal characteristic protected by applicable law . . . ." The policy also provides that "[r]etaliation against an individual who has reported a violation of this policy . . . is also prohibited and will not be tolerated."

### B.     Deborah Brangman's Employment with AstraZeneca (1996-2008).

Ms. Brangman began working for AstraZeneca on December 1, 1996, as a Marketing Manager. Throughout her tenure with AstraZeneca, Ms. Brangman held various positions related to marketing and training at the U.S. corporate headquarters in Wilmington. Eventually, in February 2008, Ms. Brangman laterally transferred to the role of Director of Learning Services within AstraZeneca's Customer Alignment Organization. Kevin Guerette, Senior Director for Brand Promotions, directly supervised Ms. Brangman for the majority of 2008 in her role as

Director of Learning Services.  Though the specifics of her projects varied, Ms. Brangman's primary responsibility when she reported to Mr. Guerette was the "AZ Academy," which was an organization charged with developing marketing materials and providing training for the marketing organization.   In evaluating Ms. Brangman, Mr. Guerette rated her performance as "partially met expectations" and noted that she needed to improve her leadership skills in several areas.

        C.     **Ms. Brangman Begins Reporting to Peter Brockie.**

In the spring of 2009, Ms. Brangman began reporting to Peter Brockie, Senior Director of Marketing Skills for Cornerstone.  Ms. Brangman's general duties and responsibilities in her position reporting to Ms. Brockie remained virtually the same as when she reported to Mr. Guerette, though some of the specific projects changed.

Ms. Brangman claims that, in July 2009, Mr. Brockie asked her to get coffee for an outside consultant from the Starbucks kiosk located within the building during a meeting attended by AstraZeneca managers and directors.  Approximately one week later, Mr. Brockie asked Ms. Brangman if she could drive one of the consultants back to his hotel after a work dinner that Mr. Brockie hosted and which Ms. Brangman attended.  Ms. Brangman said no to Mr. Brockie's request, and Mr. Brockie drove the consultant back to the hotel himself.

        D.     **Ms. Brangman Accuses Mr. Brockie of Discrimination and then Claims He Retaliated Against Her.**

On August 6, 2009, Mr. Brockie met with Ms. Brangman to deliver her 2009 mid-year performance evaluation.  Mr. Brockie's comments in Ms. Brangman's mid-year evaluation echoed those made by Mr. Guerette in Ms. Brangman's 2008 evaluations.  Specifically, Mr. Brockie stated that he "would like to see Debbie take more of a leadership role during the 2nd

3

half of the year." He further stated that he "would like to see Debbie focus on organization and attention to detail[]" and noted that she seemed to "operate in a sometimes chaotic fashion."

Within two weeks of Mr. Brockie's meeting with Ms. Brangman about her 2009 mid-year evaluation, AstraZeneca received a letter from an attorney representing Ms. Brangman which accused Mr. Brockie of discriminating against Ms. Brangman. The letter cited the July 2009 coffee and driving incidents involving the outside consultants, as well as a dinner at which Mr. Brockie allegedly complained to a colleague, Louise Butler, about Ms. Brangman's conversation being too loud and too political. After receiving Ms. Brangman's complaint, AstraZeneca's Employment Practices Partner Melissa Ayers launched an investigation, which included interviewing Ms. Brangman, Mr. Brockie, Mr. Butler, and Athena Ruhl, who directly supervised Mr. Brockie. Based on her interviews, Ms. Ayers concluded that Ms. Brangman's allegations could not be substantiated. In light of Ms. Brangman's allegations, however, Ms. Ayers suggested to Mr. Brockie that he closely monitor his interactions with Ms. Brangman moving forward. This suggestion was consistent with AstraZeneca's practice for when employees file complaints against their supervisors.

Following the August 2009 letter complaint, Ms. Brangman claims that Mr. Brockie escalated his "unfair treatment" of her. Specifically, Ms. Brangman claims that Mr. Brockie: increased her workload; excluded her from a Christmas party; interfered with her work projects; complimented her white, male counterparts while failing to compliment her contributions; gave her a rating of "partially met expectations" on her 2009 year-end performance review; and monitored her attendance.

4

      **E.**    **Ms. Brangman Files A Report With the Compliance Department Over a PowerPoint Presentation Slide.**

In mid-February 2010, Ms. Brangman complained to AstraZeneca's internal Compliance Department about a slide in a PowerPoint presentation used by Mr. Brockie at a meeting earlier that month which Ms. Brangman believed violated "the federal anti-kickback law." After noticing the alleged violation—and before reporting it to the Compliance Department—Ms. Brangman removed the slide at issue, but never personally alerted Mr. Brockie to the mistake. Although the Compliance Department ultimately followed up with Mr. Brockie about Ms. Brangman's complaint, the Compliance Department treated Ms. Brangman's complaint as anonymous and confidential at all times and never told Mr. Brockie who reported the matter. Mr. Brockie—who was unaware that Ms. Brangman had anything to do with the complaint to Compliance—later asked Ms. Brangman to send a corrective email to the participants of the workshop at which the slide at issue was presented. Ms. Brangman decided that she was not comfortable sending the email and did not send it. Instead, Mr. Brockie sent the corrective email himself.

      **F.**    **AstraZeneca Eliminates Ms. Brangman's Position during a Reorganization and Ms. Brangman Applies for Two Other Positions.**

Near the end of 2009, John McCarthy, then-Vice President Commercial Strategy and Operations for AstraZeneca, asked Dave Ilconich, then-Senior Director of Commercial Sales Learning, to create and design an organization that centralized the training functions for both Sales and Marketing. Prior to this time, AstraZeneca had a large and robust group that provided training to Sales, while only Ms. Brangman facilitated training on behalf of the Marketing organization. With the assistance of an outside consulting firm and members of AstraZeneca's Human Resources Department, Mr. Ilconich created an entirely new structure for the

Commercial Learning Organization ("CLO") based on the goals and objectives of the new department. He subsequently identified job positions and wrote job descriptions for those positions. AstraZeneca only determined which positions would be eliminated as a result of the creation of the CLO after it finalized the structure and design of the CLO.

On March 5, 2010, Mr. Brockie and Tracy Fabian, Human Resources Business Partner, met with Ms. Brangman and advised her that her current position would be eliminated as a result of the creation of the CLO. Mr. Brockie played no role in the process of creating and designing the CLO, nor did he play any role in the decision as to which positions would be eliminated as a result of its creation.

Ms. Brangman subsequently applied for two positions in the CLO: Director of Commercial Learning Management; and Director of Marketing, Commercial Operations, and Business Insight Learning. Ms. Brangman interviewed for these positions in late March 2010. Based on Ms. Brangman's performance during her interview, the interview panel concluded that Ms. Brangman was not the best candidate for either position and, as such, that she would not be offered either position. Mr. Brockie was not part of the interview team, and did not discuss Ms. Brangman with the interviewers. Ms. Brangman, who began a short-term disability leave shortly after she interviewed for these two positions, never applied for any other positions at AstraZeneca.

**G.      Ms. Brangman Begins A Medical Leave From Which She Never Returns.**

Shortly after learning that AstraZeneca was eliminating her position, and after interviewing for the two positions in the CLO, Ms. Brangman began a short-term disability leave. Ms. Brangman claims she required a disability leave because she had stress, anxiety, depression, and could not function due to Mr. Brockie's treatment of her. Betsy Rizzuto,

Occupational Health Nurse for AstraZeneca, initially approved Ms. Brangman's short-term disability leave through May 13, 2010, and subsequently extended it twice based on medical documentation submitted by Ms. Brangman's healthcare providers: first through June 9, 2010, and then through July 7, 2010.

On July 5, 2010, Ms. Brangman emailed Ms. Rizzuto from her AstraZeneca email account stating that she remained unable to work due to her continuing disability and asking what supporting information she needed to submit to obtain an additional extension of her disability benefits.  Ms. Rizzuto responded to Ms. Brangman the following day and provided her with a list of the additional information required for an extension—which was the same list of information required for Ms. Brangman to obtain her previous two extensions.  On July 7 and 8, Ms. Brangman emailed Ms. Rizzuto asking her again what information she needed to submit to obtain an additional extension.  Ms. Rizzuto promptly responded both times asking Ms. Brangman to call her to discuss.

Ms. Rizzuto did not hear from Ms. Brangman or her healthcare providers on July 9 or July 12.  Because she did not have any medical documentation to support Ms. Brangman's request for an extension, Ms. Rizzuto terminated Brangman's short-term disability benefits on July 13, with an effective date of July 8.  In terminating Ms. Brangman's benefits for lack of supporting medical documentation, Ms. Rizzuto acted in accordance with AstraZeneca's Short-Term Disability Policy, which states that "[b]enefit payments shall terminate if . . .  [t]he employee fails to submit evidence of disability or such other documents as the [Corporate Health Services] case manager requests or the STD Policy Administrator deems necessary to administer the STD Policy."  In the Termination of Benefits letter, Ms. Rizzuto advised Ms. Brangman that,

if she did not return to work by July 19, AstraZeneca would conclude that she abandoned her job and terminate her employment.

On July 19, 2010, Ms. Brangman contacted Ms. Rizzuto to appeal the decision to terminate her short-term disability benefits. Ms. Brangman did not return to work during the pendency of her appeal. On July 27, the Short-Term Disability Administrative Committee met to discuss Ms. Brangman's appeal and ultimately decided to uphold Ms. Rizzuto's decision to deny Ms. Brangman further short-term disability benefits. The Short-Term Disability Administrative Committee advised Ms. Brangman of its decision in a letter dated August 16, 2010.

Following AstraZeneca's denial of further short-term disability benefits, Brangman sought long-term disability benefits throughMetLife, which is the claims administrator for the AstraZeneca Long Term Disability Insurance Plan. On October 8, 2010 MetLife notified AstraZeneca that it denied Brangman's application for long-term disability benefits because of insufficient medical documentation. At that point, because Brangman was no longer in approved leave status, her position had been eliminated, and she had failed to secure another position within the Company, AstraZeneca terminated her employment on October 15, 2010. In her Interrogatory responses, which Brangman verified on August 16, 2012, Brangman states that she has been "disabled and unable to work since her employment at AstraZeneca."

### III. MONETARY DAMAGES CLAIMED

AstraZeneca is not seeking to recover damages from Ms. Brangman at this time.

### IV. ASTRAZENECA'S TRIAL WITNESSES

A. **Fact Witnesses**

1. Melissa Ayers
   3969 Powell Road
   Chester Springs, PA 19425

2. Peter Brockie
   AstraZeneca, L.P.
   c/o Littler Mendelson, P.C.
   1601 Cherry Street, Suite 1400
   Philadelphia, PA 19102

3. Keisha Bronson
   1011 East Sydney Street
   Philadelphia, PA 19150

4. Danlyn Brown
   14 Pennock Drive
   Garnet Valley, PA 19060

5. Louise Butler
   137 Wyeth Way
   Hockessin, DE 19707

6. Tracy Fabian
   AstraZeneca, L.P.
   c/o Littler Mendelson, P.C.
   1601 Cherry Street, Suite 1400
   Philadelphia, PA 19102

7. Kevin Guerette
   AstraZeneca, L.P.
   c/o Littler Mendelson, P.C.
   1601 Cherry Street, Suite 1400
   Philadelphia, PA 19102

8. Dave Ilconich
   AstraZeneca, L.P.
   c/o Littler Mendelson, P.C.
   1601 Cherry Street, Suite 1400
   Philadelphia, PA 19102

    9.      Brian Martin
             AstraZeneca, L.P.
             c/o Littler Mendelson, P.C.
             1601 Cherry Street, Suite 1400
             Philadelphia, PA  19102

    10.     Art McCarthy
             654 Leslie Lane
             Yardley, PA 19067

    11.     John McCarthy
             AstraZeneca, L.P.
             c/o Littler Mendelson, P.C.
             1601 Cherry Street, Suite 1400
             Philadelphia, PA  19102

    12.     Betsy Rizzuto
             6004 Madeline Drive
             Wilmington, DE 19808

    13.     Athena Ruhl
             2506 Landon Drive
             Wilmington, DE 19810

AstraZeneca reserves the right to call those witnesses identified by Ms. Brangman in her case-in-chief.

**B.**    **Expert Witnesses**

    1.      Dr. Timothy Michals
             125 South 9th Street, Suite 1003
             Philadelphia, PA 19107

             Dr. Michals' CV is attached hereto as Exhibit A.

AstraZeneca reserves the right to call those expert witnesses identified by Ms. Brangman in her case-in-chief.

## V.   ASTRAZENECA'S TRIAL EXHIBITS[1]

*See* Exhibit B.

## VI.   ESTIMATED TRIAL DAYS

AstraZeneca estimates that this case will require five (5) days for trial.

## VII.   SPECIAL TRIAL ISSUES

AstraZeneca identifies the following special legal issues, some of which will be detailed in motions in *limine*.

### A.   Ms. Brangman's Failure to Mitigate.

Ms. Brangman is seeking back pay and front pay damages from AstraZeneca. AstraZeneca can limit Ms. Brangman's ability to recover damages by establishing that she failed to meet her statutory duty to mitigate her damages. *McKenna v. City of Philadelphia*, 636 F. Supp. 2d 446, 464 (E.D. Pa. 2009). One way in which AstraZeneca may establish a failure to mitigate is by showing that Ms. Brangman withdrew from the job market. *Id.* To that end, Ms. Brangman admits that she has not sought other employment since her employment with AstraZeneca ended. Thus, there is no dispute that she withdrew from the job market and that AstraZeneca can successfully establish that Ms. Brangman failed to mitigate her damages. Ms. Brangman claims, however, that she cannot seek employment because her anxiety and depression—which she attributes to AstraZeneca—have left her completely and permanently disabled.

As a general rule, a plaintiff in an employment discrimination action is not permitted to recover back pay during any period of disability. *Id.* at 465. An exception to this general rule

---

[1] AstraZeneca reserves the right to use any pleadings or depositions in this matter as exhibits and to use any exhibits identified in Plaintiff's Pre-trial Memorandum.

exists where the plaintiff can show that the defendant caused the disability. *Id*. Thus, to recover back pay damages, Ms. Brangman must prove that AstraZeneca caused her to become completely and permanently disabled. If Ms. Brangman fails to prove by a preponderance of the evidence that (1) she is completely and permanently disabled and (2) AstraZeneca's unlawful acts caused her to become completely and permanently disabled, she will be precluding from collecting back pay or front pay because it is undisputed that she failed to mitigate her damages by withdrawing from the job market.

        **B.     Ms. Brangman Is Not Entitled to Punitive Damages.**

Ms. Brangman cannot meet the legal standard for imposing punitive damages and the Court therefore should not provide the jury with a punitive damages instruction. To recover punitive damages under Title VII, Brangman must show that AstraZeneca "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). However, an employer may not be held vicariously liable for punitive damages for the discriminatory actions of its managers when those decisions are contrary to an employer's good-faith efforts to comply with Title VII. *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 545 (1999).

Ms. Brangman cannot, as a matter of law, meet the standard for the imposition of punitive damages. AstraZeneca has policies in place which prohibit discrimination and retaliation.[2] Additionally, AstraZeneca distributes copies of its policies to its employees and

---

[2] AstraZeneca's Equal Employment Opportunity Policy emphasize its commitment "to providing equal employment opportunity without regard to race, color, religion, gender, sexual orientation, national origin, sexual orientation, national origin, age, disability, marital status, veteran status, or other personal characteristic protected by applicable law . . . ." The policy also provides that "[r]etaliation against an individual who has reported a violation of this policy . . . is also prohibited and will not be tolerated."

12

provides anti-discrimination training to its managers. These facts alone are enough to preclude Ms. Brangman's claim for punitive damages. *See Ridley v. Costco Wholesale Corp.*, 217 Fed. Appx. 130, 137 (3d Cir. 2007) (affirming summary judgment dismissing plaintiff's claims for punitive damages where employer had evidence of a policy and training). Indeed, the bar against punitive damages applies even where an employee claims her employer did not investigate a complaint of discrimination or did not investigate it thoroughly. *Id*. at 137-38 (rejecting plaintiff's argument that the employer's alleged failed investigation created an issue as to the employer's good faith effort to comply with Title VII). Finally, it is undisputed that AstraZeneca offers programs in diversity and maintains a diversity council, both of which demonstrate AstraZeneca's commitment to promoting a diverse workforce that is free from discrimination. For all these reasons, a punitive damages instruction is inapplicable in this case and should be not be given to the jury.

      **C.**    **Applicable Standard for Adverse Acts under Title VII and the DDEA.**

AstraZeneca anticipates that Ms. Brangman may try to prove her discrimination claims by pointing to the examples of alleged discriminatory treatment that she endured at the hands of Mr. Brockie and arguing that these individual acts—taken as a whole—constitute an adverse employment action. To the extent that Ms. Brangman attempts to make such an argument, the Court should prohibit her from doing so because Mr. Brockie's alleged treatment of Ms. Brangman does not constitute an adverse employment action as a matter of law.

To prevail on her claim for discrimination, Ms. Brangman must prove that AstraZeneca took an adverse act against her that was motivated by her race or gender. For purposes of Title VII discrimination claims, an adverse employment action is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits.'" *Pagan v. Gonzalez*, 430 F. App'x 170, 172 (3d Cir. 2011) (quoting *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 152-53 (3d Cir. 1999)).  For example, the Third Circuit has held that "unnecessary derogatory comments" do not rise to the level of "adverse employment actions." *Robinson v. City of Phila.*, 120 F.3d 1286, 1301 (3d Cir. 1997).  This is because such comments do not implicate "the employee's compensation, terms, conditions, or privileges of employment, deprive[] him or her of employment opportunities, or adversely affect[] his or her status as an employee." *Id*. at 1300.

Therefore, Mr. Brockie's alleged comments to Ms. Brangman requesting that she get a consultant coffee and drive a consultant to his hotel do not rise to the level of adverse employment actions.  Nor does Mr. Brockie's alleged interference with Ms. Brangman's projects or the alleged increase in Ms. Brangman's workload.  *See, e.g.*, *Johnson v. Independence Blue Cross*, No. 09-4239, 2013 U.S. Dist. LEXIS 64033, at *34 (E.D. Pa. May 2, 2013) (change in work assignments not sufficiently adverse for *prima facie* case of discrimination).  Ms. Brangman's receipt of a "partially mets" rating on her 2009 annual review is likewise insufficient, particularly because it was not a contributing factor in AstraZeneca's decision to eliminate her position.  *Id*. at *35 (plaintiff's belief that he should have been rated higher on his performance review is not an adverse employment act).  Moreover, Mr. Brockie complimenting white, male employees but not similarly complimenting Ms. Brangman is also insufficient.  *Id*. at *36 ("management's failure to nominate [plaintiff] for an [] award, circulate an e-mail complimenting his performance, or otherwise sufficiently value his contributions did not deny him "serious and tangible" workplace benefits").  Accordingly, none of these acts—standing alone—rises to the level of an adverse employment action.

Moreover, these alleged acts cannot be aggregated to support a claim for discrimination because Ms. Brangman has not pled a hostile work environment claim.  Hostile work environment claims "are made out where many separate acts, though perhaps non-actionable on their own, are aggregated to demonstrate the existence of unlawful discrimination in the workplace."  Ms. Brangman never pursued her claim based on a hostile work environment theory of liability and the standards are not interchangeable.  Thus, she "can make out a claim of discrimination only by showing that a particular complained of act was serious enough, *on its own*, to alter the nature of [her] employment." *Id.* at *33-34 (emphasis added ) (citing *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

The same is true for Ms. Brangman's retaliation claim—she cannot rely on a series of separate, non-actionable acts to meet her burden to show an adverse employment action when the acts are unaccompanied by an additional adverse impact on Ms. Brangman's employment.

    **D.**    **The Court Should Preclude Evidence and Testimony Regarding Brangman's Disability Discrimination and Retaliation Claims.**

Ms. Brangman's Complaint originally included, in addition to her current claims, claims for disability discrimination and retaliation under the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") and the Delaware Persons with Disabilities Employment Protection Act.  On June 19, 2013, the Court granted AstraZeneca's motion for summary judgment and dismissed Ms. Brangman's disability discrimination and retaliation claims under the ADAAA and the Delaware Persons with Disabilities Employment Protection Act.  This Court therefore should not permit Ms. Brangman to introduce any evidence at trial regarding her already-dismissed disability discrimination or retaliation claims, including evidence of her request for an accommodation and AstraZeneca's failure to engage in the interactive process, as

this evidence is not relevant to any disputed issues.

### E. The Court Should Preclude Rich Fante from Testifying.

In support of her discrimination and retaliation claims, Ms. Brangman alleges that AstraZeneca maintained a "culture" of discrimination. To that end, Ms. Brangman identifies Rich Fante ("Mr. Fante"), a former AstraZeneca executive, as a witness, presumably because she believes that he will testify about a comment he allegedly made in 2003 or 2004 about diversity. Because this comment is nothing more than a stray remark, and because Mr. Fante is otherwise unrelated to Ms. Brangman's claims, his testimony is irrelevant. Even if it was relevant, this Court nevertheless should exclude it because it is unfairly prejudicial, would waste time, and mislead the jury.

### F. This Court Should Preclude Testimony from Unidentified "Corporate Designees."

In her Pre-Trial Memorandum, Ms. Brangman identifies the following witnesses:

> AstraZeneca Corporate Designees most knowledgeable about AstraZeneca's compliance rules; with the requirements of the Seroquel disposition; with AstraZeneca's reporting requirements under that Decree or any other decree; and AstraZeneca's investigatory and reporting requirements regarding lawsuits alleging AstraZeneca retaliated against employees for making compliance complaints.

(*See* Pl's Pretrial Memo., D.E. 65, pp. 11.) This witness description is improper under the plain language of Fed. R. Civ. P. 26(a)(3)(A)(i). Moreover, Ms. Brangman will eventually need to issue trial subpoenas for these witnesses, and any such trial subpoenas will be deficient under Fed. R. Civ. P. 45. This Court also should preclude Ms. Brangman from obtaining testimony from any "Corporate Designees" because she has never before sought testimony on these topics, such that this is a blatant attempt by Ms. Brangman to make an end-run around the Court's

16

Scheduling Order, which closed discovery in this matter on November 12, 2012.  Finally, courts have previously rejected what Ms. Brangman is attempting to do, which is to apply the provisions of Fed. R. Civ. P. 30(b)(6) to trial testimony.

### G. This Court Should Preclude Witness Testimony from Twelve of the Witnesses Identified in Ms. Brangman's Pre-Trial Memorandum.

In her Pre-Trial Memorandum, Ms. Brangman identified the following twelve individuals who she intends to call as witnesses in her case (the "Witnesses"):  Paul Alexander; Beth Boyer; Mike Drain; Edwin Martinez; Theos McKinney; Tom Nyairo; Cheryl Roberts; Horatio [sic] Rodriquez; Janine Watson; Calvin Wise; Ed Ross; and Carol Ann Smith. (*See* Pl's Pretrial Memo., D.E. 65, pp. 11-12.)  To the extent Ms. Brangman seeks to use the Witnesses' testimony about their individual work experiences as evidence to prove that AstraZeneca discriminated against her, this Court should exclude it because it is irrelevant and would necessarily result in a series of mini-trials.  To the extent Ms. Brangman plans to have these witnesses testify about her own performance, this evidence likewise is not relevant.  Finally, the Court should preclude this evidence because it would be unfairly prejudicial, a waste of time, would cause undue delay, and would result in the needless presentation of cumulative evidence.

## VIII.  TRIAL MEMORANDUM

*See* Exhibit C.

## IX.  PROPOSED VOIR DIRE

*See* Exhibit D.

## X.  PROPOSED JURY INSTRUCTIONS

*See* Exhibit E.

XI.    **PROPOSED JURY VERDICT SHEET.**

*See* Exhibit F.

                Respectfully submitted,

*/s/* Elizabeth Tempio Clement
Thomas J. Bender, (PA #25512)
Elizabeth Tempio Clement, (PA #208344)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000 (t)
267.402.3131 (f)
tbender@littler.com
eclement@littler.com

Attorneys for Defendant
AstraZeneca, LP and AstraZeneca Pharmaceuticals, LP

Date: February 3, 2014